May I, Your Honor? Yes. Good morning and may it please the Court. My name is Rory Bellantoni and I represent the appellant in this matter. This appeal turns on a settled rule of this circuit. Under R.E. v. New York City Department of Education, an IEP and its implementation must be evaluated prospectively and a district cannot cure feasibility gaps by saying what would have happened at the proposed school. Here the IHO applied that rule. She did the math, evaluated the records, and found that the assigned school could not implement this student's IEP, which required 16 60-minute therapy sessions per week and community-based goals within a 35 class period weekly schedule. Thirty-five classes a week, seven classes a day were mandated in the IEP to be held in the classroom. The student, I'll get to the specific goals in a moment, had specific community-based goals, things that the student needed to go out in the community to do. And the IEP specifically says the student should learn how to navigate the streets, navigate the sidewalk. You can't do that in a classroom and those services cannot be pushed in. The SRO here reversed, not by showing how the IEP could actually be implemented, but by relying on assurances that services could be pushed in, could be bridged, and that the district is mandated to implement the IEP or what's in it, but never developed the record to say how that was going to happen. That's exactly what RE forbids. Well, I'm confused about that. The testimony was we can push in so that the hours that are classroom hours and the hours that are the associated services hours, to some extent, will overlap so that's not going to, that reduces, changes the math. And to the extent that we can't accomplish that by pushing in, we can contract for after hours services. Why doesn't that answer the question of how the districts can comply? Thank you for that question. There are two reasons. First of all, the idea that you can use the RSA or contract for these services is something that either should be in the This student had a one-to-one parent that had to be present at all the students, in all the students' educational classes. If RSAs were taking place at night or on the weekend outside of this setting, the parent wouldn't be there. And more specifically, the push-in services you're talking about, not only is this a question of time, how do you get, you know, six, seven, eight, nine periods into a five-period day, but in this student's occupational therapy annual goals, it said the student will increase his participation in community integration to increase independent mobility in the community by reacting appropriately to spontaneous stimuli to safely navigate obstacles and stop as needed, i.e., stopping and looking prior to crossing the street and safely navigating around obstacles. This is what the student did at the private school. This is what helped the student progress. And the student is now back in the public school. But the district didn't make plans to implement those kinds of occupational services. Talk again about, I'm sorry, the student will demonstrate increased body awareness and safety necessary to navigate his environment while navigating through doorways. I'm sorry, you said the student is back in the public school. Is the student at M751? I'm not sure where the student is. I apologize. It's a different school from the placement that drove this case. The private school. I'm not sure where in the system the student is now, but the student made so much progress at the private school by being taken into the community, by navigating his wheelchair, by interacting. One of the other goals is to have him improve his overall pragmatic skills by engaging in conversation with five people in the community, random people with minimal, moderate cues and prompts for up to five exchanges. Again, this is something that can be done in the classroom. And when the SRO evaluated the IHO's decision, he again didn't explain necessarily why the IHO and how the IEP, again, R.A. says we have to look at the IEP snapshot in time. At the time the parent moved the child to the private placement, could that IEP be implemented as it was written? And the IHO found no, it couldn't. And SRO beats did exactly, I think it was, I apologize, did exactly what R.A. says the SRO isn't supposed to do. She said, well, it would have been implemented, it could have been implemented with RSAs, it could have been implemented by bridging, it could have, R.A. and this court pretty clear in R.A. that that would have, could have, might have language is not good enough to sustain the reversal. But for free placement challenges that is based on the notion that a placement lacks the capacity, the examples that we've used to demonstrate what might be an inappropriate placement, I think it was like somebody has a shellfish out in the school, shellfish for lunch every day or something. I'm making that specific one up, but they were, they were very cut and dry in capabilities. And I think once you start getting into the range of doubting the school can deliver on what it says it can deliver, that's not going to be well suited to a pre-place, pre-challenge in advance rather than a challenge if they don't actually deliver it. I'm just trying to figure out how your position here wouldn't erode that rule. Well, it's more about what the DOE could prove or couldn't prove at the hearing. When asked how the IEP could be implemented, I believe it was Ms. Stillwagon who really didn't answer that question. The linchpin of her testimony and of the SRO's finding, if you will, she said, if it's on the IEP, we're mandated to implement it. Okay, but how? How are you going to have this student navigate roadways, talk to random strangers on a sidewalk if he's taking 35 classes in a specific room, seven classes a day, five days a week? If this program, the ratio and everything else included, maybe instead of seven classes a day, four or three classes a week and occupational therapy, I mean, it couldn't be clearer. I was going to say, if it was in the IEP to actually do the occupational therapy outside the school, that might have been appropriate. It was in the IEP. It's in the record. With the navigating roadways point that you're making now, was that discussed specifically with Ms. Stillwagon in her testimony? I saw that your mathematical argument being made and responded to her by saying that they would have 90-minute periods or 60-minute periods and there would be push-in, pull-out, and it depended what the specifics of the IEP's requirements were, but that showing that, at least as a prima facie matter, that the school was capable of meeting the specifics of the IEP. I didn't see any discussion. I might have missed it in all the testimony that your specific concern about navigating roadways was discussed. Did you induce any evidence about the school's incapability of meeting that? I didn't hear the last part of the question. Was it discussed? Did you make that argument in front of the hearing office? Specifically. Somebody said yes, because this was in the I-brain, the private school's IEP, and the student was going out into the community to learn how to do these things. I'm asking, did you raise this in specific, navigating roadways, as a concern that the parent had that the school could not meet? And Ms. Stillwagon, did she have an opportunity to respond to that? It was more, your Honor, that there was no provision that allowed the student to go into the community. I don't know if roadways or streets came up specifically. But the idea was, she was asked these questions about how are you going to meet these goals if the student isn't going into the community to meet the community-based goals. And the answer was, well, she never answered the question. She just said, if it's on the IEP, we're mandated to provide it. Okay, but how? You'd have to reconvene, have the CSE allow for time in the street or occupational therapy off-site, less classes. But this IEP is written. And we've made the number of, you know, how do you get 90 minutes and then 60-minute classes? I still am baffled by that. But I know the court pretty much affirms this, the court and the SROs, your Honor, this is more than that. This isn't just the math issue. This is also, in some of these cases, the push-in services that can be provided, like physical therapy. We'll say, how can you do physical therapy and special ed, you know, 120 minutes of each in 60 minutes? You can bring a mat into the classroom, the court has held, and do physical therapy. But you can't bring the street or the community into the classroom in this case. Okay, I think we've got your, unless you have, do you have a follow-up question? If I could, just one further question. I was troubled by the month-long delay between your client's notice to the DOE about the inadequacy of the Kennedy placement and when she sent the 10-day notice of intent. Because to me, the DOE responded in a timely way as required by the 10-day rule. And then they ultimately didn't have the chance to try to cure any objections that your client might have had before the school year started. And your client had already in the interim, before even sending the 10-day notice, she had enrolled at I-Brain. So could you explain to me why it didn't hurt your client's actions to deprive the school of an opportunity to cure any concerns about its ability to meet the IEP? Your Honor, I would say no. And only because in this case, the notice wasn't sent the way it was supposed to be according to the statute. Assuming that's, I don't want to concede it, but let's assume it for a moment. This parent specifically rejected the IEP at the CSE meeting and doesn't meet the statute, but the DOE is on notice that the parent is rejecting the IEP that was created for these reasons and could have, they don't need a 10-day notice to try to resolve a conflict they know they have with the parent. So when the parent verbally rejected the placement right at the meeting, said this won't do, they were on notice. It's unfortunate that the IEP wasn't sent the way it was supposed to be, but they had actual notice. And whether or not that's good enough, you know, maybe you'll decide that in this case or it will be decided another day. But they did have notice that the parent, and the student had been in I-Brain since I think 2018. Not that that's a given. The parent has to consider. And this parent obviously did because the child went back to public school. So this parent was never outright rejecting public school forever. This is a parent who believed that the program wasn't meeting her child's needs, made the unilateral placement, assumed that financial risk, one at the IHO level, right? And that's the other thing. This isn't just me making the argument. I understand, yeah. Thank you, Judge. Appreciate it. We'll hear, we'll hear back from you. Now we'll hear from Attorney Schiff-Wong. Yes. Good morning, Your Honors, and may it please the Court, John Schiff-Wong on behalf of the that counsel is now bringing up for the first time. I think that it's important to remember a couple of things. Number one, the IHO in this case found that the IEP was substantively adequate, and the plaintiff never appealed that determination. So the question of what was in the IEP, whether there should have been more in the IEP, is not in this case. It's not something that the plaintiff can raise at this point in these hearings. And I think that Your Honor's point about what the discussion was, what the dispute was about the substantive adequacy of M751 was not focused on this community aspect and whether push-in services were appropriate or not. I think that that is trying to rewrite what the IEP provided, which explicitly stated that push-in services were permissible for this student to provide all of the services that they needed. So that's why the testimony went in the direction that it did. There wasn't a discussion of whether there was some other inadequacy about M751 that the plaintiff never presented. So there's no burden for DOE to rebut allegations that are never actually raised to DOE in terms of the sufficiency of this school. I think that's pretty clear from this Court's determination in MO, where there is the ability to challenge a prospective placement, but DOE doesn't have a burden of production to respond to speculative assertions with regard to the particular school. They have to come forward with something more than that before DOE even has to address it. So that's why DOE addressed the mathematical issues that plaintiff now backs away from and focuses on something entirely different that was never part of these proceedings, Your Honors. So I think that just focusing on the testimony as well of Stillwagon regarding M751, I think that counsel gets the test backwards a little bit. So it is a prospective challenge, but what that means is that there has to be proof that the school cannot, cannot satisfy the IEP. It's not that it might not, not that they won't, that they cannot, do not have the capacity. And Ms. Stillwagon clearly testified that M751 had this capacity both through push-in services, which is all that was necessary to satisfy the IEP. That's how the IEP was going to be satisfied in Ms. Stillwagon's testimony. And then she also said that M751 had additional capacity with regard to contractors. I did want to ask you about that because the timeframe here, the timeline that occurred, didn't give the parent much time to inform herself about the capabilities of M751 and the potential problems with being M751. And part of the reason for the 12-month kids was that initially it seems that the DOE placed the student at the Robert F. Kennedy School, which didn't have wheelchair accessibility, which is kind of a patent flaw in the placement. And then a month goes by and Ms. Thomason notifies the DOE that RFK still doesn't have wheelchair accessibility. And then of course she doesn't give formal notice until a month later. But in the meantime, she reaches out to DOE and gets no response, no response, no response. Now, we do have a statutory regulatory protocol for formal communications and setting timelines, but I was troubled by the initial placement difficulty and then the failure to respond at all. And so I have difficulty in being too formalistic about the fact that the 10-day notice was responded to within eight days, and therefore was timely, because it was a 10-day notice. The parent then was kind of excluded from evaluating M751 in a collaborative way. So I think that what's important to remember about that point in terms of the procedure that happened here is the IDEA provides expressly for this 10-day period. And what that is essentially is the last chance for DOE to respond to contentions that a particular placement is inadequate and try and address them if there's a determination that a change needs to be made. So that's in the statute. And I think that what counsel is asking for here is just to write that out of the statute, that by raising other objections or informal e-mail communications, somehow write the 10-day notice period for DOE to respond out of the statute. Now, I think it's also important to remember that, you know, I don't know what happened in terms of the responses to the various outreach that a plaintiff says that she made, but I think it's important to remember that DOE is responsible for hundreds of thousands of students that have IEPs in the system. What about the initial placement at a non-wheelchair accessible school? Right. And I don't know what happened with that either, but in terms of the IDEA, it's not a procedural violation to make a mistake. So if DOE did make a mistake with regard to that placement and it was wheelchair inaccessible, the IDEA envisions this process where there is a back-and-forth. That includes the 10-day notice. So whether DOE... Includes or is exclusively manifested through the 10-day notice? I'm sorry. Exclusively... You said includes the 10-day notice, but I thought the IDEA, and I'm sorry for interrupting your answer, but I thought the whole point of the IDEA was to promote dialogue. And it seems like what you're saying is there was no obligation to consider feedback that this school is patently inappropriate because it can't accommodate a wheelchair unless the parent takes the sort of litigious step of filing a notice that's saying I refuse and I'm kind of withdrawing my kid. I mean, what if a parent just wants a good placement within the public school system? There's no obligation to respond to information that says this placement is completely inappropriate? I think that there is a question in terms... So I think that there isn't an obligation in the sense that the IDEA provides this period for a discussion. I think that, to your Honor's point, that the IDEA does encourage this sort of collaboration and DOE generally does give information. So that's what happened here in this case where the school provided information to the plaintiff and told her that there may have been issues with the placement in terms of this particular student. So I think that the notion that DOE doesn't do this in the normal course, I think, is not supported in the record. But I think that what's important to remember is what they're trying to create is a procedural, per se, procedural violation for something that the IDEA specifically enshrines in the statute. So there is this 10-day period. And could have DOE responded to these other emails? Should it have? I think that's a separate question from whether there was a, per se, procedural violation. And I would submit that the case law that has found this right to investigate, this Court has never adopted that case law. And I think that it runs contrary to the Court's decisions in J.C. and in C.F. where there was no information about at least part of the placement in those cases actually given and determined there was no procedural violation. But even if there is some kind of discovery period implied somehow through the IDEA, I think that it can't override the 10-day notice that is explicit within the statute that provides this opportunity for DOE to respond to any complaints that the student has made. And I think that there is a particular irony here in terms of finding a procedural violation. So their contention is that DOE provided, DOE created a procedural violation because it tried to do better. It tried to give this particular student a better placement and to respond to the concerns that had been raised. So I think that that just runs contrary to the statute's structure. I mean, are we really patting the DOE in the back for deciding not to stick with its assignment to a non-wheelchair accessible school for a wheelchair-bound student? I mean, you make it sound like the DOE went even better. It substituted something that was potentially compliant with the IEP from one that mainly wasn't. I mean, you're not arguing that Kennedy was in fact accessible. No, but I think that this is how the statute works. It makes sure that there is an opportunity for DOE to respond to issues. So an initial mistake with regard to Robert F. Kennedy, if indeed that's what it was, that's not a procedural violation because DOE is able to fix those mistakes. And it did so here within the 10-day period and with enough time for this plaintiff to evaluate the school. And I would add that the due process complaint that they filed that raised these allegations with regard to M751 was not a procedural violation. So they clearly had information. These are not novice players in this structure. This was their fourth year at I-BRAIN, I believe, and they'd gone through this process before. So it can't have been a surprise to these individuals that these sorts of requirements apply. And there's no indication in the record, they enrolled in I-BRAIN before they even submitted their 10-day notice. So there's no indication in the record that anything that DOE did actually impacted the decision process here because they had already determined that they were going to be going to I-BRAIN. And I think the record supports that as well. So even if there were some kind of procedural violation, it didn't affect anything here. Thank you. Yes, thank you. When counsel says that the IEP provided for push-in services, but we go back to again, what were those push-in services? We talked, I talked briefly about other cases where physical therapy can be, I may object to it, I may argue against it, but for this proceeding today, I can see that happens. Physical therapy, again, can be done in the classroom. That's a push-in service. But here, it's not just navigating the street. Community, this is a student with a traumatic brain injury who can function at a higher level than a lot of the other students I represent. So community-based goals were very important for this child. The child wasn't mainstreaming the way a child does with, you know, non-typical students, with non-disabled students. So the program, and again, it's not that they didn't have the goals in the IEP. In another case, I can argue that. Here, they had the goals, but they didn't provide any way this student could meet those goals. If these issues were so important, why didn't you wait until the last minute to bring them up? I'm sorry, you want me to hear that? If these issues that you just rehearsed for us were so important, why didn't you wait until the very last minute to bring them up? Again, I don't, I'm not conceding that we waited so long to bring them up. This is, it was going on at the private school, and this was something the parent raised at the CSE meeting, that you have these community-based goals. They borrowed some. Sometimes what the DOE does is they'll take the goal out of the iBrain IEP and paste it into the DOE IEP, because it's working for the student. So okay, we're going to do the same kind of therapy, and the student will progress, and the student can't stay at the private school. If we're giving the student the same service, the private school is giving the student. But they don't give them the service. They just say that that's a goal for the student. But they don't explain how they're going to provide that goal. I apologize. I don't have those sites. If Your Honor wants a supplemental briefing or a letter, I can find them. I don't have them at my fingertips. I apologize. But there's one other thing I want to address. Actually, we'll wrap it up in about 10 seconds. We don't have time for a new... Please, Your Honor, because counsel said one thing that, you know, when you're looking at the prospective placement versus retrospective, it's not, you know, could or was the IEP sufficient at the time? He said it requires proof that the IEP cannot be implemented. That is not true. And in New York, the legislature put that burden on the DOE to prove it could be. Saying that we need proof that it can't be flips that burden, puts it on the parent without technically putting it on the parent. If counsel's at that hearing saying that the parent must prove the IEP can't be implemented, that's not the parent's role in New York. It may be in other states, but it is not here. The DOE must come in and prove that it can be implemented the way it was written at the time the unilateral placement was made. Thank you. We will take it under advisement. And the next case up is 25-154, United States v. Marvin Pippins. Good morning, Your Honors. Actually, let's take a second. Just let the folks get out and we can have undistracted attention on your argument. All right. Thank you, Judge. May I proceed? Yes. Thank you. I'm Richard Levitt, along with my partner, Zach Siegel. We represent Marvin Pippins on appeal. We also represented him at trial. We've raised six issues here. Primarily, he was convicted of murder in aid of racketeering. The government alleged that he killed Sean in part to maintain or increase his position in the 5-9 grants. One of the issues, our first issue, in fact, is a sufficiency issue. That's an issue that obviously requires a great deal of attention to the specifics of the trial testimony. It's not something that I think I can probably cover in the ten minutes that we have. However, I think that some of the facts that are relevant to the sufficiency issue are also relevant to all of the other points that we have. And so what I intend to do this morning is first to discuss a few of the issues with regard to the sufficiency point, and then to move on to the two jury instruction points. And if there's any time left, I'll try to address certain of the other points. Of course, I'll answer any questions the Court has about any of them. The government's principal witness, Marcus Labore, testified that Pippins had no loyalty at all to the 5-9 grants, affirmatively testified to that. That in and of itself establishes that he had no motive linked to the 5-9 brims when he killed Sean Pert. And of course, he testified at trial that he had purely a personal motive because he believed that Sean Pert and the real rights had murdered his twin brother, Mellie. But Marcus Labore acknowledged that Mr. Pippins had no loyalty at all to the 5-9 brims. Mr. Pippins consulted no one in the 5-9 brims before he killed Sean Pert. In fact, Marcus Labore, who had been the godfather of the 5-9 brims, did not even know that Mr. Pippins had killed Sean Pert until the following year when he got out of — Could you put your comments and your arguments in context, though? Because, you know, we have the — we end up talking about a jury instruction about an enterprise-related purpose or not for a bike car murder, and we have a whole panoply of gangs of different kinds that were part of the action here, right? So the real right, the 5-9 brims, the subsidiaries of the Bloods, and then Bread Gang, and I gather there's a dispute about what Bread Gang was, whether it was a gang, whether it was not a gang, or what have you. And so it's not entirely clear to me that the testimony you've just discussed rules out that there was an enterprise-related purpose as well as potentially a personal purpose in the murder. Sure. That's a very important question. The enterprise that was the named enterprise in the indictment, the enterprise that the government had to prove Mr. Pippins acted on behalf of was the 5-9 brims, period. But what if, as alleged, the Bread Gang was kind of a subsidiary offshoot based on location? I mean, that's how gangs operate. There are subsidiary gangs. That's directly relevant, Your Honor, to our second jury instruction point, which is point three in our brief. What we asked the court to instruct the jury was that if the jury found that Mr. Pippins was not motivated to kill Sean Perk by his association with the 5-9 brims, but did find that he was motivated by his relationship to the Bread Gang, then the jury would have to decide whether or not the Bread Gang and the 5-9 brims were related in some way. And the court declined to give that instruction, which was a critically important instruction. We also included in our instruction criteria that the jury could consider when trying to resolve that issue if they had to do so. But the evidence was overwhelming, including from Marcus Laborde himself, that the Bread Gang was not part of the 5-9 brims. In fact, he said that the Bread Gang was not part of the 5-9 brims.